**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 19-cv-22932-BLOOM/Louis**

MINDY EASTERWOOD,

      Plaintiff,

v.

CARNIVAL CORPORATION,

      Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court following a bench trial held over the course of three days from December 14, 2020 to December 16, 2020. ECF Nos. [157], [159], [161]. Pursuant to this Court's order, ECF No. [92], the parties submitted proposed findings of fact and conclusions of law. *See* ECF No. [138] ("Plaintiff's Proposed Findings"); ECF No. [139] ("Defendant's Proposed Findings"). The Court has carefully considered the evidence presented at trial, the applicable law and the parties' submissions, and sets forth the relevant findings of fact and conclusions of law below.

### I.    INTRODUCTION

This case arises from significant injuries sustained by Plaintiff Mindy Easterwood ("Plaintiff") during a cruise aboard Defendant Carnival Corporation's ("Carnival" or "Defendant") vessel *Paradise.* Plaintiff was a ticketed passenger sailing from Tampa, Florida and returning to Tampa, Florida between June 3, 2019 and June 8, 2019. Plaintiff asserts that Carnival was negligent by failing "to provide a non-skid deck, keep that deck area clear of black grease and/or

oil and to employ lifeguards or pool attendants to carry out frequent inspections so as to warn of slippery areas, and remove grease and oil." ECF No. [1] ¶ 12.

## II.   FINDINGS OF FACT

Plaintiff and ten members of her family went on a cruise aboard the Carnival *Paradise* to celebrate her adoptive brother's high school graduation. On June 7, 2019, Plaintiff and her family were spending the day on the Lido Deck by the pool.

### A.  The Lido Deck and the pool

The Lido Deck on the Carnival *Paradise* is located on Deck 10 of the vessel. The pool area is located roughly midway between the bow and stern of the ship and in the center of the deck, with a stage on the stern side of the pool, and two bars off the bow side—Redfrog Rum Bar and Blue Iguana Tequila Bar. The deck surface is teak wood, and the pool is surrounded by deck chairs. The pool itself is surrounded by a lifted curb or threshold that separates the pool surface area from the surrounding teak deck. There is a shower that points over the pool surface for use by guests entering and exiting the pool, located on the port side at corner of the pool,

### B.  Christy Baker's earlier fall

Christy Baker was another passenger on the same cruise as Plaintiff and her family aboard the *Paradise* on June 7, 2019. Baker, like Plaintiff, was spending the last full day of the cruise on the Lido Deck by the pool. Approximately an hour before Plaintiff's fall, Baker was headed to dance on the Lido Deck stage, when she stepped over the edge of the pool at the shower, and her feet slipped out from underneath her. Baker fell onto her right hand and bottom. Baker was on the deck for less than one minute when her husband came over to help lift her off the deck. At the time, there were approximately 10 to 15 Carnival employees in the area who were clearing dishes and keeping the deck area dry.

Shortly after falling, a crew member escorted Baker to the medical center on the ship. The medical notes indicate that the ship's nurse, Amanda Hulley, saw Baker standing outside the medical center at approximately 1:00 p.m. when Nurse Hulley asked if she needed assistance. In response, Baker stated that she had slipped and fallen on the Lido Deck. *See* ECF No. [149-10]. Although Nurse Hulley did not remember Baker, Baker remembered that Nurse Hulley asked her what had happened, and she told Nurse Hulley that she slipped and fell by the pool. Nurse Hulley wrapped Baker's wrist, advised her to apply ice, and told her to come back to the medical center to see the doctor later in the afternoon. However, Baker did not return to the medical center.

Baker left the medical center and returned to the Lido Deck. Although Baker did not see a black oily substance on the deck when she fell; at the time of trial, she recalled a brownish substance on her bathing suit bottom that she rinsed out with water.

Approximately an hour after her fall, Baker witnessed Plaintiff fall in the same spot where Baker had fallen earlier.

**C. Mindy Easterwood's fall**

Before her fall, Plaintiff did not personally witness anyone else fall, nor did she receive any warning about the floor being slippery. There were no signs or cones indicating that the floor was slippery.

Plaintiff's fall was captured on closed-circuit television ("CCTV"). The CCTV footage admitted into evidence shows the deck busy with activity, passengers walking past the rows of deck chairs, individuals in and around the pool, games of cornhole, and numerous Carnival employees present throughout and walking around the deck. As depicted on the CCTV footage, Plaintiff was walking toward the pool on the Lido Deck of the *Paradise* behind her mother and

holding a drink in her hand. [5:22-5:28].[1] Although Plaintiff acknowledged consuming alcohol

that morning, she did not feel impaired or intoxicated at the time of her fall. As the CCTV footage

showed, Plaintiff briefly turned her head to speak to one or two individuals lying on the first row

of deck chairs facing the pool as she continued to walk toward the pool. [5:28-5:30]. Plaintiff then

turned her head to face forward and proceeded to take four steps in the direction of the swimming

pool. [5:30-5:32]. Plaintiff admitted that she did not look at the ground where she was walking.

The video depicts that on the fourth step, Plaintiff's left foot slid forward on a darkened spot of

the teak deck just outside the edge of the pool and adjacent to the shower. [5:32]. As her left foot

slid forward and out from underneath her, Plaintiff's right leg bent at the knee as she began to fall

toward the deck surface. [5:32]. Her right knee impacted the raised edge of the pool before Plaintiff

landed on her bottom on the deck surface in the darkened spot. [5:32-5:34]. According to Plaintiff,

she immediately felt pain and saw the top of her patella (kneecap) pushing out to the lateral side

of her knee, and she was concerned that it might break through the skin. Plaintiff testified that she

was in so much pain that she did not do anything to examine the deck at the time.

The CCTV footage further reflects that Plaintiff's mother then approached to assist

Plaintiff and helped her sit up. [5:34-5:38]. Plaintiff's right leg remained bent at the knee as she

shifting around. [5:38-5:43]. Over the course of the next minute, several individuals—other

passengers—approached Plaintiff, as she remained in a reclined, but in seated position, on the teak

deck floor. A Carnival employee wearing a red shirt approached to speak to the small group

assembled, [6:22], and another person in a light blue shirt and tan baseball cap also approached,

[6:29]. A few minutes later, the CCTV footage shows Plaintiff's husband, Gary Craig Easterwood

---

[1] The bracketed times refer to the relevant time signature within Defendant's Exhibit 9 during which the events occurred.

("Craig"), approaching Plaintiff, where he knelt next to her. [8:08-9:00]. Craig was not on the deck when Plaintiff fell – he was at the waterworks area on Deck 11 with his eight-year-old son and niece. In total, Plaintiff was sitting on the deck for approximately five minutes before the video shows a wheelchair arriving. [10:48].

### D.  Carnival's response and Plaintiff's transport to the medical center

Eleanor Opena, a Carnival security officer, was on duty on the Lido Deck of the *Paradise* starting at noon on June 7, 2019. She did not witness Baker's fall, nor did she witness Plaintiff's fall. While patrolling on the Lido Deck at approximately 1:45 p.m., she saw Plaintiff on the deck and called the nurse on duty. She also called room service to bring a wheelchair and contacted her supervisor, Reimar Seruelas. Plaintiff's mother told Opena that Plaintiff slipped on the wet floor. Opena observed water on the deck that had come from the shower, but she testified that she did not see any black mechanical oil or black grease on the deck. Plaintiff's family members did not tell her that they observed black mechanical oil on the deck.

Within what Craig remembered as being ten to fifteen minutes, Nurse Hulley responded to the Lido Deck to attend to Plaintiff. Nurse Hulley testified that she did not have an independent recollection of Plaintiff. However, according to her notes, she responded to the Lido Deck when Plaintiff fell. When she arrived, housekeeping staff was assisting Plaintiff onto a wheelchair. Craig testified that when he helped to lift Plaintiff up, he felt an oily greasy substance, which he noticed in the medical center was on the back of Plaintiff's legs and on her bathing suit. Nurse Hulley testified that she did not recall seeing any black grease on the floor, nor did she remember seeing a black oily substance on Plaintiff's bathing suit. Opena also testified that she had not seen black oil or grease on Plaintiff's legs.

Nurse Hulley assisted Plaintiff to the medical center on Deck 3, holding her leg immobilized. Once at the infirmary, the nurse, Craig, and Plaintiff's mother lifted Plaintiff onto a bed. Plaintiff was in pain and crying. She took off the bathing suit at the infirmary. Plaintiff testified that it was the first time she had worn the new bathing suit. When she took the bathing suit off, the bottom had a black stain on it that came from the spot where she had fallen. Plaintiff testified that the bathing suit was not stained before she fell, and she did not sit anywhere else that would have resulted in the stain. When Plaintiff removed her bathing suit, Craig put it in a plastic bag.

At the medical center, an x-ray was taken and the doctor concluded that Plaintiff had broken her knee cap. The doctor said that they would give Plaintiff some medicine, put her in a brace, take her back to her room to rest, and then disembark her to be seen at a hospital in Tampa the next day. According to her notes, Nurse Hulley saw Plaintiff approximately 51 minutes after seeing Baker.

### E.  Carnival's investigation of Plaintiff's fall

Although Nurse Hulley also could not recall what caused Plaintiff to fall, the medical records reflect that Plaintiff told Nurse Hulley that the floor was wet at the pool area and she slipped and fell. Plaintiff did not mention black oil or grease to Nurse Hulley. Reimar Seruelas, the Assistant Chief Security Officer on the Carnival *Paradise* in 2019, testified that the nurse called him about one or two hours after Plaintiff fell. Seruelas called another security officer, Gina May, to go to the medical center and check what had happened. While Plaintiff was at the medical center, Plaintiff's mother was interviewed. According to Plaintiff, she was in so much pain that she did not feel alert and was given morphine for the pain. Plaintiff's mother completed a passenger injury

statement on Plaintiff's behalf, which contains no mention of black oil or grease. There was also a guest consultation form filled out, which did not mention black oil or grease.

Carnival did not interview Craig about the incident. He was not present in the medical center at the time of Carnival's interview and investigation at the medical center because he had gone to the Lido Deck to retrieve their personal belongings. According to Craig, he looked at the spot where Plaintiff fell and saw what looked like an oily substance, but he did not take any pictures of the spot at the time. Once Plaintiff was back in the cabin, Craig went up to get their son, and on his way, he used his cell phone to take pictures on the Lido Deck.

Seruelas testified that May reported to him that a guest had an accident on the deck near the pool. Seruelas checked the area of the fall a couple of hours later after reviewing the CCTV and saw water in the area where Plaintiff fell. According to Opena, Seruelas also told her to check the deck after Plaintiff's fall, and she did not see any black mechanical oil at that time.

### F. Carnival injury reporting protocol

Carnival has a protocol regarding fall and injury reporting according to which an injury is reported to security only if the injury requires treatment beyond first aid. The ship doctor decides whether an injury is reportable. If the doctor determines an incident is reportable, a passenger is given a passenger injury statement to complete as part of the security investigation. Carnival's policy is that the doctor makes the determination as to whether an incident is reportable to security. At that point, an accident report investigation would be initiated.

Nurse Hulley did not report Baker's injury to security because Baker's incident did not rise to the reporting level, as she was provided only first aid. In addition, because Baker did not return and was not seen by the doctor, her incident was not reported, and no investigation was conducted by Carnival.

### G.  Testing conducted on the bathing suit

After Craig put Plaintiff's bathing suit in the plastic bag while in the medical center, the bag was not opened again until it was sent to ALS Environmental Lab in Jacksonville, Florida for testing. ALS received Plaintiff's bathing suit on September 30, 2019.

Tatyana Yeremyants, the technical manager of the organic department at ALS, conducted gas chromatography testing on Plaintiff's bathing suit. Specifically, ALS conducted EPA 8015C, which is a test used for analysis of petroleum hydrocarbon by gas chromatography. The test was conducted against four standards, including mineral spirits, fuel oil #6, creosote oil, and used motor oil compound. There were traces of the same oil in both the stained and clean samples of the bathing suit tested, but not in the same quantity. The result of the testing was that the substance in the bathing suit did not match any of the products exactly, but it most closely resembled the used motor oil compound. Ultimately, the conclusion was that the substance in the bathing suit was a petroleum-based product, but it was not one of the four substances used in the test standard. The lab did not identify precisely what stained the bathing suit.

### H.  Testing conducted on the deck

Dr. Zdenek Hejzlar is a contractor that Carnival hires to do annual testing on Carnival ships, specifically slip resistance testing on the decks. Dr. Hejzlar has a Ph.D. in occupational health and safety and he works for Engineering Systems Incorporated. He is a senior managing consultant with 30 years of experience working with slip, trip, and fall events. He also has an undergraduate degree in textile chemistry, which is the study of polymer chemistry—fibers that are either natural or manmade. He is a certified walkway auditor and has participated extensively in research and development of standards and guidelines related to the evaluation and safety of walkway surfaces. Particularly, he works with the cruise line and resort industry, specifically

tribometry and evaluating walkway surfaces, different materials applied to decks, and researching the best way to clean those surfaces. He provides consulting services for various cruise lines, including Carnival.

Initially, Dr. Hejzlar was hired by Carnival's safety department in 2015 to do tribometry work on ships, mostly around the restaurant areas. Around 2016 and 2017, he essentially began to test every ship in the fleet sailing out of U.S. ports. Regarding this case, he was asked to provide technological assistance and analysis with respect to human factors and tribometry. He has been testing the teak on the Lido Deck of the *Paradise* annually since 2017. In 2019, he tested within a month of Plaintiff's accident. According to Dr. Hejzlar's tests, the teak decks tested at or above the applicable standard. Each time Dr. Hejzlar has tested the teak on the *Paradise*, his opinion to a reasonable degree of scientific certainty is that the deck was reasonably safe. However, Dr. Hejzlar also acknowledged that his testing only shows how much coefficient of friction was available on the deck surface, but not what the utilized coefficient of friction might be. The testing does not indicate how much a person in a particular situation, such as Plaintiff, will utilize the available coefficient of friction.

Dr. Hejzlar testified regarding the general properties of teak and offered an alternate theory of what the substance on Plaintiff's bathing suit could be. Teak in general is very durable and slip resistant in both wet and dry conditions and has been used for thousands of years on ships. As teak weathers through exposure to sun, heat, and saltwater, the oil in the top microscopic layer dries and turns the upper layer of teak gray. According to Dr. Hejzlar, the fibers of the teak become hair-like on the surface that acts almost like a micro carpet, which enhances slip resistance when wet. If an area of the deck is wet, it does not make slip resistance decrease more quickly than other parts of the deck. As the sun attacks the teak, oil dries and evaporates out of the teak, leaving the

hair-like substance and tiny fragments that are essentially a dark powder. When that powder mixes with water, it could certainly stain a bathing suit, but would come out relatively easily.

Dr. Hejzlar's hypothesis is that the stain on Plaintiff's bathing suit was cellulose fragments and any dirt dust that was on the floor at the time of her fall. He examined the bathing suit under a microscope and found fragments consistent with fragments from cellulose or just solid dirt. He also noted that he saw no oil residue when he took the bathing suit out of the bag and that there was no level of transfer. He testified that if the substance were capable of being rinsed out with water, it would indicate to him that the substance is either dirt or fragments of cellulose that would come off the top layer of the aged weathered teak because a heavy oil substance would not be soluble in water. Dr. Hejzlar also reviewed the ALS lab test results of the bathing suit and he noted that the clean part of the bathing suit tested had almost twice the amount of oil in it than the stained portion that was tested. However, on cross-examination he also acknowledged that the clean sample size was approximately twice as large as the stained portion tested.

Nevertheless, Dr. Hejzlar confirmed that there are a couple of different areas between the boards and under the boards used on the teak decks that are hydrocarbon-based material. Over time, these compounds can begin to break down, and liquid can travel from the top to underneath the boards. According to Dr. Hejzlar, any type of hydrocarbons on the teak deck would stay afloat on top of the water.

With respect to the proper way to clean teak, Dr. Hejzlar testified that teak should only be rinsed with salt water, unless there is a stain, and then a cleaner will be used. He acknowledged that from time to time Carnival uses a chemical called Frazmar to clean the decks – which is essentially a mild soap solution used with a special machine that scrubs and extracts for appropriate disposal.

## I.   Carnival's cleaning protocol

According to Seruelas, housekeeping personnel are always roaming around and cleaning the decks. If there is an area where the deck is slippery, a security officer is responsible for placing a warning sign. According to Monica Borcegue, Carnival's litigation representative, the Lido Deck had been washed early in the morning of the day that Plaintiff fell. The Lido Deck is regularly washed every two to three days. The Lido Deck is maintained and cleaned daily and around the clock by the housekeeping department. The washing process involves hosing and use of chemicals by the deck department and housekeeping also uses a cleaner. According to Borcegue, a battery powered floor cleaning machine is used by housekeeping to scrub the floors—to clean both indoor tiled areas and outside decks. Borcegue acknowledged that Frazmar is a chemical used by the housekeeping department on the teak decking. Seruelas testified that he has seen a small car-sized vacuum used to suck up water on the Lido Deck.

## J.   Plaintiff's return home and surgery

When the *Paradise* arrived in Tampa on June 8, 2019, Plaintiff was met by an ambulance and taken to Memorial Hospital of Tampa. At the hospital, her diagnosis of a broken kneecap was confirmed and she was told that she would need surgery. Plaintiff and her family decided to travel by car to their home in Cedartown, Georgia for surgery. The return to Cedartown took approximately twelve hours, during which Plaintiff testified to being very uncomfortable and in considerable pain. When they arrived in Cedartown, Plaintiff went to Polk General Hospital, and was then taken by ambulance to Floyd Medical Center to be seen by Dr. Justin Dunn, the orthopedic surgeon on call. Plaintiff was admitted to the hospital around midnight on June 9, 2019.

Dr. Dunn is a board-certified orthopedic surgeon at Rome Orthopedic Center, who specializes in knee and hip related problems with an emphasis on joint reconstructions. He was on

call when Plaintiff went to the emergency room upon her return to Cedartown. According to Dr. Dunn, Plaintiff had a comminuted fracture of the patella in which a piece from the bottom of her kneecap broke off. Dr. Dunn performed surgery on June 9, 2019. He discovered that the fracture fragments in Plaintiff's knee were too small to be repaired and were removed. The remainder of the patella was reattached to the patellar tendon using sutures, with the expectation that the reattached portion of the patellar tendon would adhere to the bone on the lower portion of the patella over time.

After the surgery, Plaintiff's right leg was placed in a brace with her knee straightened. Plaintiff stayed in the hospital until her discharge on June 11, 2019. According to Dr. Dunn, there were no complications during surgery. In his opinion, Plaintiff has had a good result.

Dr. David Barry Keyes, a board certified and re-certified orthopedic surgeon and Defendant's expert, testified that there were no loose fragments remaining in Plaintiff's knee and there was no damage to the anterior cruciate ligament ("ACL") or to the articular surface of the knee as a result of Plaintiff's fall. Dr. Keyes opined that Dr. Dunn performed an excellent surgery and concurred with Dr. Dunn's assessment that Plaintiff has had a good surgical result.

**K.  Post-operative recovery and physical therapy**

When Plaintiff was sent home, she was able to ambulate with a walker and was taking opioid medication for her pain. According to Craig, Plaintiff was not really mobile for two or three weeks following the surgery and had to be assisted in her daily tasks.

Dr. Dunn saw Plaintiff two weeks after her surgery, on June 25, 2019, and she was doing as expected. Her second follow-up was July 9, 2019, when she complained of moderate pain. Dr. Dunn testified that at the time, from an orthopedic standpoint, Plaintiff was doing okay. In total, Plaintiff had six follow-ups with Dr. Dunn. The last follow-up was October 1, 2019, when Dr.

Dunn released her. At that point, Dr. Dunn felt that nothing could be done medically to change the progress of her recovery. He testified that it is unlikely that Plaintiff will recover 100% to pre-injury baseline, as "[m]ost patients don't reach their pre-injury baseline after something like this. There are some permanent limitations." ECF No. [150-8] at 22.

According to Dr. Dunn, Plaintiff's physical therapy protocol was standard. David Snider, a physical therapist who practices at Floyd Medical Center in Cedartown, Georgia, was Plaintiff's physical therapist, co-worker, and her direct daily boss.[2] When Plaintiff began her physical therapy regimen 18 days after surgery, she was on weight bearing and range of motion restrictions, with her leg locked straight in the brace. At the time, she was using a rolling walker to ambulate.

During the first four weeks of physical therapy, she worked on range of motion 0-45 degrees, hamstring strengthening, extension, and weight bearing. From weeks four through six, she worked on quad strengthening. From weeks eight through twelve, she worked on range of motion, walking without the brace, with the goal of returning to work duties, squatting and kneeling. Ultimately, the goal was to get Plaintiff's right leg to 80% strength. She had to wear the brace up to six weeks locked, and from weeks six to eight the brace could be unlocked for some bending from 0-30 degrees. Thereafter, the goal was to eliminate the brace all together. In total, Plaintiff completed 22 physical therapy sessions and achieved 80% of her goals when she was released on September 12, 2019. Snider testified that Plaintiff progressed well with therapy.

According to Dr. Jacquelyn Terry, Plaintiff's primary care physician, Plaintiff experienced some range of motion issues, so she re-referred Plaintiff for some additional physical therapy in April, 2020.

---

[2] Plaintiff is Snider's office manager.

**L.  Effects of the injury and Plaintiff's pre-existing conditions**

With respect to her knee, Plaintiff testified at trial that she feels that her recovery has plateaued, and that she is where she will be the rest of her life. Although her pain has improved, she cannot put a lot of weight on her right knee and she has trouble descending stairs. This was consistent with Dr. Dunn's assessment. When he saw Plaintiff in October, 2019, she still had some restrictions, including knee pain on stairs. Dr. Dunn opined that the restrictions and pain would probably persist for deep knee bends, squatting, kneeling and repetitive stair climbing.

Dr. Keyes conducted an examination of Plaintiff on November 20, 2019. At the time, she advised of discomfort in her knee with some of the activity limitations, and some numbness. He did not feel that the car ride from Tampa to Cedartown did anything to worsen or aggravate Plaintiff's injury. When he examined her, she had normal gait with no limping, and no effusion in her knee. He noticed some difference in flexion, with 126 degrees in the right knee and 135 degrees in the left knee, and noted some atrophy in her right leg, which is typical post-operatively, but expected to improve over time. Snider testified that as of December 6, 2019, Plaintiff's legs were not the same size.

Dr. Keyes testified further that Plaintiff felt discomfort when he palpated the patella, patellar tendon, and quadriceps tendon. Plaintiff had normal strength in extending her leg and no instability in the knee. Further, she did not have any major nerve damage; she had decreased sensation near the surgical scar. He took x-rays and noted that her knee has tiny pieces of ossification, but with no clinical significance, as the material is in place and not floating in her knee. He noted no visible arthritis. Dr. Keyes acknowledged, as did Dr. Dunn, that Plaintiff's injury places her at a slightly increased risk for arthritis and there is a possibility that she could develop arthritis in the future. However, according to Dr. Keyes' review, he believes it to be unlikely.

Plaintiff had bariatric surgery on June 18, 2020, and the indication is that Plaintiff no longer has difficulty on stairs and ambulates normally. Overall, his assessment is that Plaintiff will not need any future formal medical treatment to her knee and there is no need for a knee replacement. Dr. Keyes assigned a 5% impairment rating to Plaintiff's body as a whole, and a 12% to 13% permanent impairment of the lower right extremity according to the AMA Guidelines for Permanent Impairment.

According to the evidence in this case, Plaintiff has a history of anxiety, depression, and panic attacks for which she takes medication. Plaintiff acknowledged that she suffered from anxiety and occasional panic attacks and was medicated for these conditions before her fall. According to Plaintiff, her anxiety and panic attacks got worse after her fall. She testified to having anxiety associated with returning to work and a fear of falling. Dr. Terry also noted that Plaintiff's anxiety intensified after her injury and that Plaintiff experienced worsening issues with insomnia, which required additional medication and increased doses of her existing medications. Dr. Terry attributed Plaintiff's issues to the stress of not being able to work, being stuck at home, and not feeling like she was contributing to the household. In Dr. Terry's opinion, Plaintiff's anxiety and depression did increase as a result of some of the consequences of the accident, but Dr. Terry could not say definitively with respect to any of Plaintiff's other conditions (cardiac, obesity, etc.).

**M. Plaintiff's employment**

At the time of her fall, Plaintiff was a front office coordinator for Floyd Medical Center outpatient physical therapy clinic at their satellite hospital, Polk Medical Center. Snider, her physical therapist, was and is also her co-worker and direct daily boss. Before Plaintiff's cruise, she performed indirect patient care assisting the physical therapists by helping patients off the

table, opening doors, and assisting patients with balance problems. Snider testified that Plaintiff had no limitations before her injury.

After her injury, she has the same job as before, but she is not performing at the same level. Snider limited her duties, and she does not do much indirect patient care. In June of 2019, she was working Monday through Thursday 8-5 and Fridays from 8-12. She was paid $16.725 per hour. As a result of her accident, she missed work from June 10 until August 12, 2019. When she returned to work, she had anxiety that she may lose her job if she was not able to perform all her functions and duties as before, and she had limitations and pain.

## III.    CONCLUSIONS OF LAW

"Maritime law governs actions arising from alleged torts committed aboard a ship sailing in navigable waters." *Guevara v. NCL (Bah.) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019) (citing *Keefe v. Bah. Cruise Line, Inc.*, 867 F.2d 1318, 1320-21 (11th Cir. 1989)). "In analyzing a maritime tort case, [courts] rely on general principles of negligence law." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (quoting *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980)).[3] "To prevail on a negligence claim, a plaintiff must show that '(1) the defendant had a duty to protect the plaintiff from a particular injury, (2) the defendant breached that duty, (3) the breach actually and proximately caused the plaintiff's injury, and (4) the plaintiff suffered actual harm.'" *Guevara*, 920 F.3d at 720 (quoting *Chaparro*, 693 F.3d at 1336).

"A cruise-ship operator 'is not liable to passengers as an insurer, but only for its negligence.' The mere fact of an accident causing injury is insufficient to establish that a dangerous condition existed." *D'Antonio v. Royal Caribbean Cruise Line, Ltd.*, 785 F. App'x 794, 796-97

---

[3] The United States Court of Appeals for the Eleventh Circuit has adopted, as binding precedent, all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

(11th Cir. 2019) (quoting *Keefe*, 867 F.2d at 1322); *see also Looney v. Metro. R.R. Co.*, 200 U.S. 480, 486 (1906) ("A defect cannot be inferred from the mere fact of an injury. There must be some proof of the negligence."); *Miller v. NCL (Bah.) Ltd.*, No. 15-cv-22254, 2016 WL 4809347, at *4 (S.D. Fla. Apr. 6, 2016) ("Generally, ship owners and operators do not owe a heightened or special duty of care to their passengers." (citing *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959))), *aff'd*, 679 F. App'x 981 (11th Cir. 2017). Rather, "[u]nder maritime law, the owner of a ship in navigable waters owes passengers a duty of reasonable care under the circumstances." *Sorrels v. NCL (Bah.) Ltd.*, 796 F.3d 1275, 1279 (11th Cir. 2015). "In other words, a cruise ship operator's duty is to shield passengers from known dangers (and from dangers that should be known), whether by eliminating the risk or warning of it." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1178 (11th Cir. 2020). Thus, a cruise-ship operator's liability often "hinges on whether it knew or should have known about the dangerous condition." *Guevara*, 920 F.3d at 720; *see also D'Antonio*, 785 F. App'x at 797.

> To establish the owner of a ship in navigable waters breached its duty of care, a plaintiff must show: "(1) a dangerous condition existed; [and] (2) the vessel's operator had actual notice of the dangerous condition; or (3) if there was no actual notice, that [d]efendant had constructive notice of the dangerous condition for an interval of time sufficient to allow the vessel's operator to implement corrective measures." *Reinhardt v. Royal Caribbean Cruises, Ltd.*, No. 1:12-cv-22105, 2013 WL 11261341, at *4 (S.D. Fla. Apr. 2, 2013) (alteration added; citations omitted).

*Stewart v. Carnival Corp.*, 365 F. Supp. 3d 1272, 1275 (S.D. Fla. 2019).

Carnival contends that it is not liable for Plaintiff's injuries because Plaintiff has failed to prove that there was black grease or oil on the deck where she fell, and that black grease or oil was the cause of Plaintiff's fall. As such, Carnival maintains that it had no duty to warn of the condition because it was open or obvious, and that, in any event, Carnival had no actual or constructive notice of the condition.

### A.  A dangerous condition existed that was not open or obvious

"Under federal admiralty law, a cruise ship has no duty to warn of known dangers that are open and obvious." *Krug v. Celebrity Cruises, Inc.*, 745 F. App'x 863, 866 (11th Cir. 2018) (citing *Keefe*, 867 F.2d at 1322); *see also Chaparro*, 693 F.3d at 1336 (explaining that "a cruise line owes its passengers a duty to warn of known dangers"). "The analysis used to determine Defendant's duty in maritime law is intertwined with the analysis of whether a dangerous condition, in fact, existed." *Miller*, 2016 WL 4809347, at *4. "A dangerous condition is one that is not apparent and obvious to a passenger." *Id.* (citing *Smolnikar v. Royal Caribbean Cruises, Ltd.*, 787 F. Supp. 2d 1308, 1315 (S.D. Fla. 2009)). As the Eleventh Circuit has explained, "[a]n open and obvious condition is one that should be obvious by the ordinary use of one's senses." *Krug*, 745 F. App'x at 866 (citing *Lugo v. Carnival Corp.*, 154 F. Supp. 3d 1341, 1345-46 (S.D. Fla. 2015)); *see also Lancaster v. Carnival Corp.*, 85 F. Supp. 3d 1341, 1344 (S.D. Fla. 2015) (noting that open and obvious conditions are "discernable through common sense and the ordinary use of eyesight"). "[Courts] evaluate whether a danger would be open and obvious from an objectively reasonable person's point of view and do not focus on the plaintiff's subjective perspective." *Krug*, 745 F. App'x at 866 (citing *Lugo*, 154 F. Supp. 3d at 1345-46). "The mere fact that an accident occurs does not give rise to a presumption that the setting of the accident constituted a dangerous condition." *Miller*, 2016 WL 4809347, at *4.

Carnival contends that Plaintiff cannot prove that there was black grease or oil on the Lido Deck in the spot where she fell, and that the inability to do so is fatal to her case. However, as the Court noted in its Omnibus Order on the parties' cross motions for summary judgment, ECF No. [131], Plaintiff does not have to identify precisely what she fell on or where it came from in order to prevail upon her claim. "Plaintiff's inability to herself 'identify whether there was a foreign

18

substance on the floor prior to her [fall] . . . does not necessitate the conclusion that her theory of liability is entirely hypothetical.'" *Haiser v. MSC Cruises (USA) Inc.*, No. 18-cv-60964, 2019 WL 4693200, at *4 (S.D. Fla. Aug. 9, 2019) (quoting *Merideth v. Carnival Corp.*, 49 F. Supp. 3d 1090, 1093 (S.D. Fla. 2014) (finding that even though plaintiff did not personally know what caused her to slip, the evidence demonstrated a more-than-speculative likelihood that condensation or the general condition of the tiles may have caused the floor to become slick where there was crewmember testimony on the increasing slipperiness of the floor over time)); *see also Villa v. Carnival Corp.*, 207 F. Supp. 3d 1311, 1314 (S.D. Fla. 2016) ("[T]he fact Plaintiff cannot identify the substance he slipped on, how it got there, or how long it was there, does not mean there was no dangerous condition.").

The evidence in this case demonstrates that a dangerous condition that was not open and obvious existed on the Lido Deck in the area where Plaintiff fell. First, Dr. Hejzlar testified that teak should only be rinsed with salt water, while Borcegue testified that the Lido Deck is regularly washed every two to three days with chemicals by the deck department. Dr. Hejzlar acknowledged that Carnival uses a chemical called Frazmar, which is a mild soap solution, to clean the decks. Borcegue testified that she was aware that Frazmar was regularly used on the deck surfaces and that the Lido Deck had been cleaned the morning of Plaintiff's fall.

Second, while no Carnival employee testified to seeing the presence of a black oily substance on the deck in the spot where Plaintiff fell, or on Plaintiff once she was removed from the deck, the evidence supports that the dangerous condition was present. Plaintiff's husband testified that he saw a black oily substance on the back of Plaintiff's legs, which he noticed at the medical center. Christy Baker testified that she rinsed a black or brown substance out of her bathing suit after she fell in the same spot where Plaintiff fell, and after being on deck for what she testified

to be less than a minute. Plaintiff testified that the bathing suit was brand new and that it was the first time she wore it. The witnesses were credible, and the Court credits their testimony. The CCTV footage shows that before Plaintiff's fall, no stain or mark on the back or bottom of Plaintiff's bathing suit was present, and Plaintiff remained with her bottom on the deck for approximately five minutes. Moreover, that no Carnival employee saw the substance on deck supports the conclusion that the dangerous condition was not open and obvious. It is undisputed that the bottom of Plaintiff's bathing suit was soiled with a dark brown or black substance, which according to the ALS testing, contained hydrocarbons that most closely approximated used motor oil.

Third, Dr. Hejzlar testified that there are a couple of different areas between the boards and under the boards used on teak decks that are hydrocarbon-based material. He further agreed that, over time, these compounds can begin to break down and liquid can travel from the top to underneath the boards and then cause a situation in which the liquid squirts up around the boards when stepped on. In speaking about the bedding compound and seal compound used on the teak decks, Dr. Hejzlar testified that "all of that would be organically based, petroleum based. Whether it's an adhesive or actual polymer that is – that becomes polymerized when it cures, it's still going to be a hydrocarbon. It's just going to be a different form."

> Q. So we've got at least a couple of different areas between the boards and under the boards that are hydrocarbon-based material, correct?
>
> A. Sure.
>
> Q. And over time, those compounds begin to break down; is that correct?
>
> A. They can. I don't have any specific information about that, but they certainly can.

[. . .]

A. When you trap [the hydrocarbons] underneath the boards, you have – there's really very few places where it can evaporate, so it stays down there.

Q. And you've never – and then sometimes when people are walking on it, it squirts back up between the boards, doesn't it?

A. Correct and I have tested that.

Dr. Hejzlar further testified that "stuff can get from the top to the bottom if there is a crack in the teak or in the seal." When questioned further, he conceded that he did not know if any of the materials leached out into the water:

Q. Did any of the materials in the sealing compound or in the compounds between the boards or in the teakwood boards leach out into the water?

A. I don't know.

In addition, he testified that any type of hydrocarbons on the deck would stay afloat on top of water on the teak. The Court is not persuaded by Dr. Hejzlar's alternate theory that the substance on Plaintiff's bathing suit was teak fibers and dirt, because his theory does not otherwise explain the presence of a petroleum-based substance on the stained portion of Plaintiff's bathing suit. In addition, while Dr. Hejzlar visually inspected the bathing suit and reviewed the ALS test results, he did not conduct any chemical testing of his own on the bathing suit and did not test for any substances on the *Paradise* deck. Importantly, his slip resistance testing of the *Paradise* decks was conducted nearly a month after Plaintiff's fall, and Dr. Hejzlar conceded that his testing only indicates the available coefficient of friction, and not the coefficient of friction actually utilized by Plaintiff. As such, the Court finds that Dr. Hejzlar's testimony concerning slip resistance is of limited utility.

Thus, notwithstanding the fact that Plaintiff was not able to prove exactly what substance was present on the deck at the time of her fall, the preponderance of the evidence demonstrates that something other than, or in addition to, water was present on the Lido Deck surface in the spot where Plaintiff fell, creating a condition that was dangerous and not open or obvious.

Carnival presented evidence from the CCTV footage showing three individuals traversing without incident the same area of deck where Plaintiff and Baker fell to suggest that the condition was not dangerous; however, simply because other individuals were fortunate not to fall in the spot where Baker and Plaintiff each fell within an hour of one another does not establish that a dangerous condition did not exist. The fact that other individuals were able to traverse the same area where Plaintiff and Baker fell further supports a finding that the dangerous condition was not open or obvious.

Thus, the Court must next consider whether the evidence presented at trial supports a finding that Carnival had actual or constructive notice.

**B.  Carnival had both actual and constructive notice**

The duty of reasonable care requires, "as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition." *Keefe*, 867 F.2d at 1322. "Actual notice exists when the shipowner knows of the unsafe condition." *Lebron v. Royal Caribbean Cruises Ltd.*, 818 F. App'x 918, 920 (11th Cir. 2020) (citing *Keefe*, 867 F.2d at 1322). "To show notice, it is not enough to demonstrate merely that the defendant negligently created or maintained its premises." *Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1303 (11th Cir. 2020) (citing *Everett v. Carnival Cruise Lines*, 912 F.2d 1355, 1358-59 (11th Cir. 1990)). "Rather, the plaintiff must establish that a cruise line in fact knew or should have known that a particular hazard existed." *Id.*

Here, the evidence supports a finding that Carnival had actual notice of a dangerous condition on the Lido Deck by the pool through Nurse Hulley. The undisputed evidence is that Christy Baker fell in the same spot that Plaintiff did, approximately one hour before Plaintiff's fall, that Baker was seen in the medical center by Nurse Hulley, and she told Nurse Hulley that she had slipped and fallen by the pool. In addition, Baker testified that, although she could not remember who, someone from Carnival escorted her to the medical center, and that at the time of her fall, there were approximately ten to fifteen Carnival employees in the area. Although Carnival's injury reporting protocol was not triggered as a result of Baker's fall because she never saw the doctor, the fact remains that Baker remembered being escorted to the medical center, and Nurse Hulley recorded in her notes that Baker had slipped and fallen on the Lido Deck. Nevertheless, there was no evidence that Nurse Hulley alerted any staff on the Lido Deck – be it housekeeping, security, or the deck department – that a passenger had slipped and fallen on the Lido Deck.

In addition, the evidence supports a finding that Carnival was on constructive notice of the dangerous condition on the Lido Deck as a result of Baker's earlier fall. "A maritime plaintiff can establish constructive notice with evidence that the 'defective condition exist[ed] for a sufficient period of time to invite corrective measures.'" *Guevara*, 920 F.3d at 720 (quoting *Monteleone v. Bah. Cruise Line, Inc.*, 838 F.2d 63, 65 (2d Cir. 1988)) (citing *Keefe*, 867 F.2d at 1322; *Rodgers v. Costa Crociere, S.p.A.*, No. 08-60233, 2009 WL 10666976, at *3 (S.D. Fla. July 6, 2009)). "Alternatively, a plaintiff can establish constructive notice with evidence of substantially similar incidents in which 'conditions substantially similar to the occurrence in question must have caused the prior accident.'" *Id.* (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 661-62 (11th Cir. 1988)).

The evidence established that Baker fell in the same spot as Plaintiff less than one hour

before Plaintiff fell, on a deck full of people, including Carnival employees. Notwithstanding that

fact, there were no warning signs placed by the spot where Baker fell before Plaintiff's fall, and

there was no evidence presented that any Carnival employee investigated the spot or attempted to

clean it until after Plaintiff fell.

### C.  Comparative negligence

Generally,   "[m]aritime   law   recognizes   the   doctrine   of   comparative

negligence . . . [c]omparative negligence is a theory of negligence where the plaintiff is entitled to

damages even if he or she is found to be more at fault than the defendant, but damages awarded

will be reduced by percentage of fault attributable to plaintiff." *In re Gozleveli*, No. 12-61458-CV,

2015 WL 3917089, at *4 (S.D. Fla. June 25, 2015) (citations omitted); *see also Pope & Talbot,*

*Inc. v. Hawn*, 346 U.S. 406, 409, (1953) (upholding lower courts' decision that comparative

negligence applies in maritime cases); *see United States v. Reliable Transfer Co.,* 421 U.S. 397,

411 (1975) (admiralty law recognizes "pure" comparative negligence, under which damages are

apportioned according to the relative fault of each party).

In support of its contention that Plaintiff was comparatively negligent, Carnival relies on

two distinct theories – that Plaintiff was not watching where she was going and altered her gait in

the moments before she fell, and that she was drinking before her fall suggesting that she was

impaired. The Court is not persuaded that Plaintiff was comparatively negligent under either

theory.

First, although Plaintiff admitted that she did not look at the ground where she was walking,

the CCTV footage shows that as Plaintiff was approaching the pool, and four steps before she

slipped, she had turned her head back to face forward and was facing in the direction that she was

walking. While she may not have been looking at the ground as she was walking, she was looking

forward and in the direction of her gait. As such, the evidence is insufficient to lead to the conclusion that Plaintiff was not sufficiently attentive. In addition, as the Court has already determined that there was a substance on the Lido Deck in the spot where Plaintiff fell that created a dangerous condition that was neither open nor obvious, even if Plaintiff had been looking at the ground where she was walking, she would not have necessarily observed the dangerous condition in order to be able to avoid it. Moreover, the Court does not find Plaintiff's change of gait prior to her fall to be significant. The CCTV footage shows that Plaintiff took the second of her first two steps perhaps slightly faster after turning her head back to face forward, but by the fourth step (upon which her left foot slipped out from underneath her), her gait had slowed again. Thus, the Court does not agree that the purported change in gait contributed to Plaintiff's fall.

Second, Carnival expended considerable effort at trial presenting evidence to support its theory that Plaintiff was impaired as a result of her alcohol consumption in the hours leading up to her fall. However, Carnival's medical records in this case indicate unequivocally that neither alcohol nor drugs contributed to the incident. *See* ECF No. [145-6] at 8. The records also indicate that Plaintiff's affect was normal and appropriate, and there are no notations regarding potential limitation due to impairment by alcohol. *Id*. In addition, Plaintiff does not display any obvious impairment visible on the CCTV footage and she testified that she was not intoxicated. Accordingly, there is insufficient evidence to prove that Plaintiff was impaired by her alcohol consumption.

Carnival has failed to prove that Plaintiff was comparatively negligent on either of the theories presented. As such, the Court will not reduce Plaintiff's damages to account for any comparative negligence.

### D. Damages

As a result of the injuries sustained as a result of Carnival's negligence, Plaintiff seeks damages for past, present, and future pain and suffering; temporary total disability and permanent partial disability; loss of wages and wage earning capacity; and health care expenses; orthopedic appliance expenses; occupational therapy; and medical and surgical, including physical therapy expenses in the past, present, and future.

At trial, the mortality table was read into evidence establishing a life expectancy of 42.2 years for a 40-year-old white female. The following damages were established, which the Court finds to be reasonable, and which Plaintiff is entitled to recover:

1.  Pain and suffering based on a 13% permanent impairment to the lower right extremity

    -   $50.00 daily from date of the incident through approximate date of trial = **$27,000.00**[4]

    -   $25.00 daily based upon Plaintiff's 42.2-year life expectancy = **$385,075.00**[5]

2.  Reasonable medical expenses in the amount of **$29,895.29** (based upon the parties' stipulation at trial regarding a medical lien amount of $28,312.47 and $1,582.82 in payroll deductions to Plaintiff)

3.  Lost wages for the period of June 10, 2019 to August 12, 2019 = **$6,021.00**.[6]

---

[4] Plaintiff requested "$30.00 daily for the past eighteen months since the date of the incident through about the approximate date of trial." Plaintiff's Proposed Findings ¶ 37. However, she then used $50.00 as the base of her calculation with the formula "$50.00 x 30 days x 18 months" to reach a total of $27,000.00 for past non-economic damages. *Id.* ¶¶ 37, 38(a). At trial, Plaintiff again requested $50.00 per day for a total of $27,000.00. Upon review, the Court finds that $50.00 per day is reasonable.

[5] Plaintiff requested "$25.00 daily through her life expectancy of 42 years ($25.00 x 365 days x 42 years)" yielding a total of $383,250.00 in future non-economic damages. Plaintiff's Proposed Findings ¶¶ 37, 38(b). Based upon the mortality table read into evidence at trial, Plaintiff's life expectancy is 42.2 years, yielding the total of $385,075.00 ($25.00 x 365 x 42.2).

[6] Plaintiff requested "loss of wages from June 10, 2019 through August 12, 2019: 40 hours a week x $17.75 hourly for 320 hours and amounting to: $5,680.00." Plaintiff's Proposed Findings ¶ 33. Plaintiff testified at trial that she missed work from June 10, 2019 until August 12, 2019, that her rate of pay was $16.725 per

These sums lead to total damages in the amount of **$447,991.29**,[7] for which the Court will enter judgement in favor of Plaintiff by separate order pursuant to Rule 58 of the Federal Rules of Civil Procedure.

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 25, 2021.

BETH BLOOM
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

---

hour, and that she worked 40 hours per week. There are nine weeks between June 10, 2019 and August 12, 2019, or 360 work hours, yielding a total of $6,021.00 assuming the correct rate of pay (40 x 9 x 16.725).
[7] At trial, Plaintiff requested a judgment in the amount of $400,000.00, which is a "close approximation" of the numbers. The Court finds that $447,991.29 was the full measure of damages established by the evidence presented at trial.